EXHIBIT 17

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN EGERER, et al.,

               Plaintiffs,                 Case No.: 1:06cv0789

               v.

WOODLAND REALTY, INC., et al.,

                                Hon. Richard A. Enslen

               Defendants.          Hon. Ellen S. Carmody
_____/

## DEFENDANT CHICAGO TITLE OF MICHIGAN, INC. ("CTMI")
## ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES

**Interrogatory No. 1**  Identify every person or entity known to Chicago Title of Michigan who has knowledge of the facts and allegations contained in the Plaintiffs' First Amended Complaint or in Answers and Affirmative Defenses filed by any Defendant, and for each person or entity identified, state the subject matter of his or her information or knowledge, whether a written or recorded statement of the person or entity exists, and whether you intend to call the person or entity as a witness at trial.

**ANSWER:**

The individuals and entities presently known to CTMI with knowledge relating to this dispute are set forth in Defendants' 26(a)(1) disclosures.  To the extent this is seeking discovery of conversations between CTMI and its counsel relating to the subject matter of this litigation, CTMI objects on attorney-client privilege grounds.  At this stage of the litigation, CTMI has not determined its trial witnesses.

**Interrogatory No. 2**  Identify the person signing the answers to these interrogatories, and identify all persons who provided information or assisted in the preparation of the answers to these interrogatories and identify all documents relied upon in formulating the answers.

**ANSWER:**

Fred Perlini signed the interrogatories.  Mr. Perlini, Scott Goldberg, and Kevin Kossen provided information regarding the interrogatory responses.  All documents relied upon in formulating the answers to these interrogatories will be produced in accordance with Plaintiffs' request for production of documents.

PLAINTIFF'S
EXHIBIT

17

PENGAD-Bayonne, N. J.

**Interrogatory No. 3**  Identify all marketing or promotional programs in which Chicago Title of Michigan participates where Chicago Title of Michigan pays "marketing credit," "marketing dollars," or compensation of any type or amount to agents, brokers, associate brokers, sales associates, agencies, persons or entities affiliated or associated with real estate agencies, or persons or entities with any ownership interest in real estate agencies.

**ANSWER:**

CTMI objects to this interrogatory as overbroad and unduly burdensome.  Due to the RESPA one-year statute of limitations, Plaintiffs cannot advance claims relating to transactions that extend more than one year beyond the filing of the complaint in this matter.  CTMI further objects that this interrogatory is premature, because the information sought does not relate to class certification issues.  Subject to the foregoing objections, CTMI states that documents were previously produced that reflect the number of marketing dollars credits issued and redeemed for the periods in question.  Further, without waiving those objections, CTMI is not in possession of this information for all transactions in Michigan, since it does not keep track of how agents handle their operating costs.

**Interrogatory No. 4**  With respect to any contention, claim or defense of Chicago Title of Michigan that the payment of the Woodland Title Marketing Credit of $15 (as referenced in the attached Exhibit I, page 43 of the Woodland Realty Commission Program) for the Egerer Home transaction complied with the Real Estate Settlement and Procedures Act of 1974, as amended, 12 U.S.C. § 2601, *et seq.* ("RESPA"), and its associated regulations at 24 C.F.R. § 3500 *et seq.*, identify all facts, reasons and opinions that Chicago Title of Michigan relies on in support of such contentions, all documents referring or relating to such contentions, and all persons and entities having knowledge relating to such contentions.

**ANSWER:**

With regard to the specific transaction in question, Woodland Title's agent, Pat Siler, provided Woodland Title with "benefits or services" in the form of marketing and advertising on behalf of Woodland Title.  Although not relevant to the analysis under RESPA, these marketing materials also benefited Plaintiffs, as they were used to attract prospective purchasers of Plaintiffs' home.  CTMI is currently investigating whether additional benefits or services were rendered in connection with the $15 Marketing Credit program.

The Marketing Dollars program complied with RESPA because the $15 payment did not constitute a "fee, kickback or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement services . . . shall be referred to any person."  There was no "agreement or understanding" that Woodland Realty agents direct business to Woodland Title or CTMI in exchange for the $15 Marketing Dollars credit.  This credit was not contingent upon the agreement of any Woodland Realty agent or agents to direct business to Woodland Title or CTMI, and, in fact, the credit was regularly paid with regard to listings that did not result in a closing at Woodland Title.  Moreover, in the Affiliated Business Disclosure document that Plaintiffs signed, Plaintiffs were advised that they

2

were "welcome to shop around to determine whether you are receiving the best services and/or the best rate for this service." Individuals with knowledge relating to this issue include Jack Bouman, Pat Siler, Fred Perlini, Bill VandeVusse and Scott Goldberg.

In addition, the Marketing Dollars program did not violate RESPA because the $15 credit represented "payment to any person of a bona fide . . . payment for goods or facilities actually provided or for services actually performed." The payment operated to defray the cost of marketing services that Woodland Realty agents, like Mr. Siler, provided on behalf of Woodland Title. See, for example, the color copies of fliers used in connection with the sale of Plaintiffs' home, which marketed the services of Woodland Title. Individuals with knowledge relating to this issue include Jack Bouman, Pat Siler, Fred Perlini, Bill VandeVusse and Scott Goldberg.

This response reflects the present state of CTMI's knowledge and information regarding this issue, and CTMI reserves the right to raise other claims and defenses that may become known through the course of discovery.

**Interrogatory No. 5**  During the time that Chicago Title of Michigan handled the Egerer Home and Boyink Home transactions, describe in detail the written or verbal standards, practices, and procedures Chicago Title of Michigan used to comply with the Real Estate Settlement and Procedures Act of 1974, as amended, 12 U.S.C. § 2601, *et seq.* ("RESPA"), and its associated regulations at 24 C.F.R. § 3500 *et seq.*

**ANSWER:**

CTMI is unclear as to what Plaintiffs mean by "verbal standards, practices, and procedures." CTMI objects to this interrogatory as overbroad and unduly burdensome because no time or geographic limitations have been placed on the interrogatory. CTMI also objects as to relevance, since it does not concern class certification issues and calls for description of standards, practices, and procedures from offices and time periods having nothing to do with this litigation.

**Interrogatory No. 6**  Identify whether a Woodland Title Marketing Dollars payment (as referenced on page 43 of the Woodland Realty Commission Program) of any amount was paid in connection with the Boyink Home transaction, and identify the payor, the payee, and all documents related to that transaction.

**ANSWER:**

CTMI is not in possession of this information or documents which would indicate the answer to this Interrogatory.

**Interrogatory No. 7**  For each answer to Plaintiff's First Set of Requests to Admit to which Chicago Title of Michigan has responded in any manner other than by an unqualified admission, identify all facts, reasons and opinions upon which Chicago Title of Michigan bases its denial or

other response, provide the identity of all persons who may testify to any such facts, and identify all documents that contain, relate to or reflect any such facts.

**ANSWER:**

Responses sufficient to answer this interrogatory are included within the answers to Plaintiffs' Requests to Admit.

**Interrogatory No. 8**  With respect to any contention, claim or defense of Chicago Title of Michigan that an Affiliated Business Arrangement Disclosure Statement was provided to and/or signed by Ms. Boyink, identify all facts, reasons, opinions and documents that Chicago Title of Michigan relies on in support of such contentions, claim or defenses, all documents referring or relating to such contentions, and all persons and entities having knowledge relating to such contention, claim or defense.

**ANSWER:**

CTMI is not in possession of this information or documents which would indicate the answer to this Interrogatory.  Woodland Title and/or Woodland Realty and/or their employees would have such knowledge.

**Interrogatory No. 9**  Identify whether the Woodland Title Marketing Dollars program (as referenced on page 43 of the Woodland Realty Commission Program), or any similar or related program, is still in use today. If such a program has been discontinued, identify the date it was discontinued, and identify all facts, reasons and opinions that Chicago Title of Michigan considered in deciding to discontinue such a program, and identify all documents referring or relating to the decision, and all persons and entities having knowledge relating to the decision.

**ANSWER:**

To the extent this is seeking discovery of conversations between CTMI and its counsel relating to the subject matter of this litigation, CTMI objects on attorney-client and work-product privilege grounds.  CTMI also objects on relevance grounds.  Without waiving these objections, the Marketing Dollars program has not been discontinued.

**Interrogatory No. 10**  Identify all other title agencies, business entities, joint ventures, or business affiliations in which Chicago Title of Michigan has any ownership interest, and identify the dates of ownership, the extent of ownership, and the names of all other parties involved in the business entity, joint venture, or business affiliation.

**ANSWER:**

CTMI objects to the extent that this Request calls for production of documents not in its possession. CTMI also objects on the basis of relevancy, since this Request does not call for the production of documents reasonably calculated to lead to the discovery of admissible evidence in this matter.

**Interrogatory No. 11** Describe in detail all instances where Chicago Title of Michigan was involved in providing, producing, printing, or paying for postage, for post cards or any other promotional materials or assistance for real estate agents, brokers, associate brokers, sales associates, agencies, persons or entities affiliated or associated with agencies, and describe the types of all such materials or assistance, the dates such material or assistance was provided or created, the fair market value of such materials or assistance, and the recipients of such materials or assistance.

**ANSWER:**

CTMI objects to the extent that this Request calls for production of documents not in its possession. CTMI also objects on the basis of relevancy, since this Request does not call for the production of documents reasonably calculated to lead to the discovery of admissible evidence in this matter, nor does it relate to class certification issues.

**Interrogatory No. 12** With respect to any contention, claim or defense of Chicago Title of Michigan that there are defenses available to some members of the class that are not available to the Plaintiffs, identify all facts, reasons and opinions that Chicago Title of Michigan relies on in support of such contentions, all documents referring or relating to such contentions, and all persons and entities having knowledge relating to such contentions.

**ANSWER:**

CTMI has no such information at the present time, but discovery is ongoing. CTMI reserves the right to raise this issue in the event the discovery reveals that there may, in fact, be additional defenses as to other members of the putative class.

**Interrogatory No. 13** With respect to any contention, claim or defense of Chicago Title of Michigan that there are uncommon questions of law or fact for individual class members that predominate over the issues of law and fact that are common to the class, identify all facts, reasons and opinions that Chicago Title of Michigan relies on in support of such contentions, all documents referring or relating to such contentions, and all persons and entities having knowledge relating to such contentions.

5

**ANSWER:**

At the present time, CTMI can identify the following individual issues of law and fact that will predominate in this matter:

1. if the Court permits the class to include individuals with transactions outside the one-year period from the filing of the complaint, whether those members of the class can demonstrate affirmative concealment and due diligence to timely bring a claim;
2. what services were provided in exchange for the Marketing Dollars credit with respect to each transaction;
3. whether any individual claimant shopped for less expensive title insurance and found a better price, and from which company;
4. whether an individual claimant who had real estate services provided by Woodland Realty actually ended up purchasing title insurance from Woodland Title.

Discovery is on-going, so CTMI reserves the right to add to this list as other issues become known.

The persons having knowledge of these individual issues are the individual members of the putative class.

**Interrogatory No. 14** Identify all revenue and work sharing arrangements between Chicago Title of Michigan and Woodland Title Agency, LLC, including a detailed description of the employees responsible for settlement services activities, including the examination and evaluation of title evidence, the preparation and issuance of the title commitment, the clearance of underwriting objections, the preparation and issuance of the policy and the handling of the closing or settlement, the costs charged to customers for each such activity, and the division of that revenue from closings or settlement between Chicago Title of Michigan and Woodland Title Agency, LLC.

**ANSWER:**

CTMI objects to the extent that this Request calls for production of documents not in its possession. CTMI also objects on the basis of relevancy, since this Request does not call for the production of documents reasonably calculated to lead to the discovery of admissible evidence in this matter, nor does it relate to class certification issues.

6

As to the Objections:

Dated:  April 18, 2007

*Sarah Riley Howard*

William K. Holmes
Brian J. Masternak
Sarah Riley Howard
WARNER NORCROSS & JUDD LLP
111 Lyon Street, N.W., Suite 900
Grand Rapids, Michigan 49503
616.752.2000

Attorneys for Defendants Woodland Title,
Woodland Realty, Chicago Title of Michigan, Inc.,
Chicago Title Insurance Company

EXHIBIT 18

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN EGERER, et al.,

                Plaintiffs,                      Case No.: 1:06cv0789

                  v.

WOODLAND REALTY, INC., et al.,

                               Hon. Richard A. Enslen

                  Defendants.        Hon. Ellen S. Carmody
_____/

**DEFENDANT CHICAGO TITLE INSURANCE COMPANY**
**ANSWERS TO PLAINTIFFS' FIRST REQUEST TO ADMIT**

1.    The $15.00 Woodland Title Marketing Credit referred to on p. 43 of Woodland Realty, Inc.'s Commission Program Manual is a thing of value.

**ANSWER**:

Denied. The defined term "thing of value" under RESPA applies only to goods or services provided in exchange for a referral. Because the marketing credits at issue in this case were provided and honored regardless of whether Woodland Title ultimately received any business in connection with the listings that generated such credits, they are not "things of value under RESPA." Further, the $15.00 Woodland Title Marketing Credit has no "value" whatsoever unless and until redeemed by the agent to whom it is provided.

2.    CTIC derived financial benefit from issuing title insurance policies for Woodland Title Agency, LLC customers.

**ANSWER**:

Admitted.

Dated: April 18, 2007             *Sarah Riley Howard*

                                  William K. Holmes
                                  Brian J. Masternak
                                  Sarah Riley Howard
                                  WARNER NORCROSS & JUDD LLP
                                  111 Lyon Street, N.W., Suite 900
                                  Grand Rapids, Michigan 49503
                                  616.752.2000
                                  Attorneys for Defendants Woodland Title,
                                  Woodland Realty, Chicago Title of Michigan, Inc.,
                                  Chicago Title Insurance Company

1390610-1

PLAINTIFF'S
EXHIBIT

18

DIGAD-Bayonne, N.J.

# EXHIBIT 19

# OPERATING AGREEMENT

## OF

## Woodland Title  Agency, LLC

## a Michigan limited liability company

PLAINTIFF'S
EXHIBIT

19

PENGAD-Bayonne, N. J.

WT000250

## ARTICLE 2 -
## CAPITAL CONTRIBUTIONS, MEMBERSHIP SHARES, AND CAPITAL ACCOUNTS

### 2.1   *Membership Interests.*

Each Member owns a *Membership Interest* (as defined in the Act) in the Company, represented by the Member's Shares in the Company.  Each of the Members has made an initial capital contribution and owns the number of Shares specified below:

| Member | Initial Capital Contribution | Shares |
|---|---|---|
| Woodland Realty | | 50 |
| Chicago Title of Michigan, Inc | | 50 |
| Total | | 100 |

### 2.2   *Members' Capital Accounts*

**2.2.1**   The Company shall maintain a separate Capital Account for each Member. Each Capital Account shall be:

(a)   increased (i) for the amount of cash and the fair market value of any property (net of any liabilities secured by the property that the Company assumes or takes subject to) that the Member contributes and (ii) for the Member's share of any of the Company's income or gain and

(b)   decreased (i) for the amount of any cash and the fair market value of any property (net of any liabilities secured by the property that the Member assumes or takes subject to) distributed to the Member, (ii) for the Member's share of any losses and deductions of the Company, and (iii) for any expenditures under IRC 705(a)(2)(B).

**2.2.2**   If a Member's Shares, or any portion of them, are transferred in accordance with this Operating Agreement, the transferee shall succeed to the Capital Account of the transferring Member or to any portion that is transferred.

**2.2.3**   All of the provisions above regarding the establishment and maintenance of Capital Accounts are intended to comply with Treas Reg 1.704-1(b)(2)(iv) and shall be interpreted and applied to comply with this Treasury Regulation. The Members further agree to make any adjustments to the Capital Accounts that may be necessary or appropriate to comply with the Treasury Regulation.

**2.2.4**   Except as otherwise expressly provided in this Operating Agreement or under the Act, no Member is entitled to receive any interest or return on any contributions to the Company or on the Member's Capital Account, nor does any Member have any interest, right, or claim in or to any of the Company's assets.

4

WT000254

# SMITH DECLARATION

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STEPHEN EGERER, et al.,

           Plaintiffs,                  Case No.: 1:06cv0789

           v.

WOODLAND REALTY, INC., et al.,

           Defendants.                Hon. Richard A. Enslen

                                            Hon. Ellen S. Carmody

_____/

**Declaration of James F. Smith Pursuant to Fed.R.Civ.P. 56(f)
In Opposition to Defendants' Motion for Summary Judgment**

James F. Smith declares as follows:

1.    I am an attorney of record for the Plaintiffs in the above-referenced action who is involved in the briefing, discovery, and the general handling of this matter on behalf of the Plaintiffs, and I am therefore familiar with the facts of the case and its procedural posture.

2.    The Defendants have filed a counter motion seeking summary judgment in this matter, attaching various affidavits and documents in an effort to establish certain facts.

3.    Discovery opened a short time ago, and to date, the Defendants have recently answered written discovery.  The parties have conducted the deposition of just one witness, Jack Bouman, which took place on February 9, 2007.  I attended the Bouman deposition.

4.    Should the Court elect to consider the Defendants' summary judgment arguments, the
      Plaintiffs request, at a minimum, that the Court defer any ruling on summary judgment
      until there has been sufficient time or opportunity to conduct written and oral discovery
      on the present Defendants, the new Defendants named in the First Amended Class Action
      Complaint, filed contemporaneously herewith, and on any potential third parties with
      relevant knowledge.

5.    If given more time, additional discovery would be conducted in at least the following
      areas:

      a)    Whether the doctrines of equitable tolling, waiver, estoppel, and other equitable
            and legal principles preclude the Defendants from asserting and enforcing any
            statutes of limitation against the class members.  The Defendants have admitted in
            written discovery responses that the alleged wrongful conduct was never
            disclosed to the Plaintiffs.  The sole deposition taken so far has already
            established that the Plaintiffs could not have discovered the wrongful conduct
            through the exercise of reasonable diligence.  Additional evidence is expected to
            be adduced that corroborates such testimony.

      b)    During his February 9, 2007 deposition, Jack Bouman, the owner and president of
            Woodland Realty and owner/member of Woodland Title, testified that Chicago
            Title paid for, produced and mailed promotional post cards for the benefit of
            Woodland Realty agents, as an inducement to direct additional closing business to
            Chicago Title companies.  This illegal payment and acceptance of a "thing of
            value" in connection with the referral of real estate settlement services constitutes
            another violation of RESPA that will need to be explored in further discovery.  In

particular, Plaintiffs will need to discover the full nature and scope of all such promotional programs paid for by Chicago Title companies for the benefit of the Woodland companies.

c)      As set forth in greater detail in the Plaintiffs' Combined Reply in Support of Plaintiffs' Motion for Judgment on the Pleadings and Response in Opposition to Defendants' Motions to Dismiss and for Summary Judgment, filed contemporaneously herewith, Mr. Bouman testified at his deposition that the "Woodland Title" business operation was run entirely by Chicago Title company employees, yet the revenue is split between the Woodland companies and Chicago Title.  This arrangement is in plain contravention of RESPA's requirements, as the Woodland companies are receiving revenue from Chicago Title for each transaction referred, even though the Woodland companies perform no real estate settlement services.  Plaintiffs will need to discover the full nature and scope of this arrangement between Chicago Title companies and the Woodland companies.

d)      Also as set forth in greater detail in the Plaintiffs' contemporaneous filings, Mr. Bouman testified that Woodland Realty's ABA Disclosure Statement is intended to provide accurate information to Woodland Realty customers, which information would enable customers to "shop around to determine whether [they] are receiving the... best rate for this service."  Mr. Bouman agreed that it would be misleading for Woodland Realty, Woodland Title, and Chicago Title companies to print a rate of $330 on the ABA Disclosure Statement when that rate is lower than the actual filed rate that Chicago Title had submitted to the State of Michigan.  Attached hereto as Plaintiffs Exhibit 7 is a true and accurate copy of the Rate Manual of Chicago Title Insurance Company filed with the State of

Michigan on April 8, 2002.  The Court can take judicial notice of the Rate Manual pursuant to Fed.R.Evid. 201(b).  This Rate Manual (for Zone II) states that Chicago Title will charge a customer $350 for a $50,000 Owner's Policy.  Yet the ABA Disclosure Statement Woodland Realty and Chicago Title provided to the named Plaintiffs quotes a rate of $330 for this coverage, thereby misleading the customer into thinking that the title insurance cost from Chicago Title is less expensive than the actual charge they will face at closing, and effectively precluding any recipient from meaningfully comparing prices with competing settlement service providers.  Plaintiffs need to conduct discovery to determine the nature and scope of the Defendants' misleading ABA Disclosure Statement.

e)      Mr. Bouman testified that he was unclear on which Chicago Title companies were involved in providing which services to customers referred to Woodland Title. (Bouman dep. p. 12:3-12).  Mr. Bouman also made a point to distinguish between the different types of settlement services provided as part of a complete array of services needed to complete a real estate closing. (Bouman dep. p. 52:11-16). Plaintiffs need to conduct additional discovery to determine the precise relationship and role of the various Chicago Title companies involved in these transactions.  This will assist the parties and the Court to determine whether the Defendants' wrongful conduct also violated any provisions of the Michigan Insurance Code, or was otherwise subject to government regulation.

6.      The Plaintiffs reasonably believe that such discovery will enable them to refute the Defendants' contentions asserted in the Defendants' dismissal and summary judgment motion, and enable the Plaintiffs to file their own cross-motion for summary judgment on the same and additional issues.

7.     Attached as Exhibit 8 are copies of reports of HUD agency actions to enforce RESPA

involving allegations similar to the facts of the present case.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

James F. Smith                                      Date

# EXHIBIT 7

CHICAGO TITLE INSURANCE COMPANY

RATE MANUAL OF

TITLE INSURANCE

FOR THE STATE OF MICHIGAN

ZONE II

The All-Inclusive Rate Plan shall be applicable to policies covering lands located in the following counties of the State of Michigan:

ALLEGAN, BARRY, CLINTON, EATON, GRAND TRAVERSE, INGHAM, IONIA, KENT, LEELANAU, MONTCALM, MUSKEGON, NEWAYGO AND OTTAWA

The rate applies to ordinary risks for both commercial and residential transactions based upon a single chain of title.  When the examination of title involves more than one chain of title or a chain of title of unusual complexity, or when additional work is requested by the insured, a work charge of $100.00 per hour will be charged.  Other than the additional charges referred to in the preceding sentence, this rate plan expresses the rates to be charged for each of the coverages described.

The Company reserves the right to decline any application for the issuance of a policy or for the increase of an existing policy.

Owners Policies will not be issued in an amount less than the market value of the property.  Loan Policies will not be issued for an amount less than the mortgage or the unpaid balance thereof.  Leasehold Policies will not be issued for less than the aggregate of the rentals payable under the lease in connection with which the policy is requested, or the market value of the premises, whichever is less.

CHICAGO TITLE INSURANCE COMPANY (II) (R 3/02)



PLAINTIFF'S
EXHIBIT
7
PENGAD-Bayonne, N. J.

1

ALL-INCLUSIVE RATE PLAN INDEX

I.     OWNERS POLICIES, LEASEHOLD POLICIES;
AND LOAN POLICIES WITHOUT STANDARD EXCEPTIONS
RATE SCHEDULE .......................................................................................... 4

II.    LOAN POLICIES WITH STANDARD EXCEPTIONS RATE SCHEDULE ...................... 4

III.   REISSUE OF OWNERS POLICIES ........................................................................ 5

IV.   STANDARD EXCEPTIONS ON OWNERS POLICIES
PROVISIONS FOR REMOVAL ............................................................................ 5

V.    REISSUE OF LOAN POLICIES ........................................................................... 6

VI.   LIMITED COVERAGE RESIDENTIAL LOAN POLICIES ........................................ 6

VII.  LIMITED LOAN COVERAGE POLICY (LLCP) FILED FORM 8230 ......................... 7

VIIa  ALTA RESIDENTIAL LIMITED COVERAGE JUNIOR LOAN POLICY... ................. 7

VIII.  ENDORSEMENTS TO OWNERS, LEASEHOLD OR LOAN POLICIES
WHICH EXTEND THE EFFECTIVE DATE OF THE POLICY ................................. 8

IX.   ENDORSEMENTS TO OWNERS LEASEHOLD OR LOAN POLICIES
WHICH DO NOT EXTEND THE EFFECTIVE DATE THEREOF ............................ 8

X.    LOAN POLICY WITH AN OWNERS POLICY ISSUED
SIMULTANEOUSLY ......................................................................................... 8

XI.   MASTER POLICY INCLUDING SITE CONDOMINIUMS ...................................... 8

XII.  NEW CONSTRUCTION RATE ........................................................................... 8

XIII.  SHORT TERM CONSTRUCTION OR BUILDERS LOAN POLICY .......................... 9

XIV.  SHORT FORM RESIDENTIAL LOAN POLICIES .................................................. 9

XV.  ABSTRACT CREDIT ......................................................................................... 9

XVI.  POLICIES INSURING LAND CONTRACT INTERESTS ........................................ 9

XVII.  GENERAL RULES FOR EXCEPTIONS SHOWN UNDER SCHEDULE "B" FILED FORMS
2202, 2203, 2203-34, 3149, 3354, 3518,
3520, 3526, 8284 & 11109, .............................................................................. 9

XVIII.  GENERAL RULES FOR USE OF CONTINUATION SCHEDULES
FILED FORMS 3631, 3237 AND 3505 .................................................................. 9

XIX.  COMMITMENT AND POLICY FORMS .............................................................. 10

XX.     ZONING ENDORSEMENT
.................................................................................................10

XXI.    USURY ENDORSEMENT
.................................................................................................10

XXII.   REFINANCE LOAN
        POLICIES.................................................................................... 10

XXIII.  GENERAL RULES FOR
        RESIDENTIAL TITLE INSURANCE POLICY (8263)
        ALTA OWNERS POLICY (8296) AND
        ALTA LEASEHOLD OWNERS POLICY ENDORSEMENT .................................10

XXIV.   POLICY AT CLOSING ENDORSEMENT (PACE) .......................................10

XXV.    ENDORSEMENTS AND APPLICABLE CHARGES.........................................11

XXVI    MICHIGAN DEPARTMENT OF TRANSPORTATION RATES................................ 13

XXVII.  ALTA HOMEOWNER'S POLICY OF INSURANCE....................................14
        ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY

XXVIII. MASTER HOME EQUITY LOAN POLICY... ...........................................14

XXVIX.  EXTRAORDINARY RISK FEE.......................................................15

XXX.    FREDDIE MAC RESIDENTIAL REFINANCE RATE.................................... 15

I.     OWNERS POLICIES;
          LEASEHOLD POLICIES;
          LOAN POLICIES WITHOUT STANDARD EXCEPTIONS

| Amount of Liability | Basic Rate |
|---|---|
| First $10,000 (or fraction) | $190.00 |
| Each additional $1000 (or fraction) including $50,000 | $4.00 |
| Each additional $1000 (or fraction) including $100,000 | $3.00 |
| Each additional $1000 (or fraction) including $300,000 | $2.50 |
| Each additional $1000 (or fraction) including $4,000,000 | $2.00 |
| Each additional $1000 (or fraction) including $5,000,000 | $1.50 |
| Each additional $1000 (or fraction) over $5,000,000 | $1.00 |

II.     LOAN POLICIES WITH STANDARD EXCEPTIONS

| Amount of Liability | Basic Rate |
|---|---|
| First $19,000 (or fraction) | $190.00 |
| Each additional $1000 (or fraction) including $50,000 | $2.50 |
| Each additional $1000 (or fraction) including $100,000 | $2.00 |
| Each additional $1000 (or fraction) including $300,000 | $1.75 |
| Each additional $1000 (or fraction) including $5,000,000 | $1.50 |
| Each additional $1000 (or fraction) over $5,000,000 | $1.00 |

\*THE STANDARD EXCEPTIONS ARE:

(1)     Rights or claims of parties in possession not shown by the public records.

(2)     Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

(3)     Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished.

CHICAGO TITLE INSURANCE COMPANY (II) (R 3/02)

imposed by law and not shown by the public records.

NOTE:  For removal of exceptions (1), (2) and (3), above, see IV (A), (B) and (C)

III.    REISSUE OF OWNERS POLICIES

When any Owners Policy is surrendered, credit up to the face value of the old policy will be given towards the purchase of a new Owners Policy in accordance with the following table, with the minimum charge being $190.00 for the new policy.  Additional insurance will be issued at the full published rate.

| Effective date of Existing Policy | Percent Credit |
|---|---|
| Less than 3 years old | 40% |
| 3 years to 5 years | 20% |
| over 5 years | 10% |

When a title policy is applied for in connection with a foreclosure of a mortgage or land contract or to insure a voluntary conveyance in lieu of a foreclosure, the rate in force covering the issue and reissue of Owners Policies will apply, with a minimum of $190.00.

IV.    STANDARD EXCEPTIONS ON OWNERS POLICIES - (PROVISIONS FOR REMOVAL)

(1)    Rights or claims of parties in possession not shown by the public records.

(2)    Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

(3)    Easements or claims of easements not shown by the public records and existing water, mineral, oil and exploration rights.

(4)    Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public record.

(5)    Taxes or special assessments which are not shown as existing liens by the public records.

(6)    Restrictions upon the use of the premises not appearing in the chain of title.

Upon request of the applicant and the presentation of evidence satisfactory to the insurer any one or all of the foregoing Standard Exceptions MAY be removed from residential policies at no additional charge.  In contemplating whether any or all of the Standard Exceptions may be removed, the company must assess each request individually.  The Company must be supplied with:

A)    An acceptable, fully completed Standard Extended Coverage Questionnaire (see attached form), or comparable affidavit. This applies to exceptions 1, 2, 3, 4, 5, and 6 of the Owners Policy and 1, 2 and 3 of the Loan Policy.

B)    A current dated survey and surveyor's certificate showing all improvements, easements, encroachments and the possessory rights of others, or comparable affidavit. This applies to exceptions 1, 2, and 3 of the Owners Policy and 1 and 2 of the Loan Policy.

C)   Satisfactory evidence that there has not been work done or materials furnished within the last 120 days. If work has been done or material furnished within the last 120 days, appropriate sworn statements, lien waivers, notices of furnishing and personal/corporate undertakings or an acceptable affidavit must be obtained. The company will also consider the builder and project before agreeing to remove Standard Exception 4. This applies to exception 4 of the Owners Policy and exception 3 of the Loan Policy.

D)   For exception 6 above to be removed, in addition to the Extended Coverage Questionnaire, a supplemental search of the records may be necessary.

## V.   REISSUE OF LOAN POLICIES

When either an Owners or Loan Policy is surrendered, credit based on the face value of the old policy will be given towards the purchase of a new Loan Policy in accordance with the following table, with a minimum fee of $190.00 for a policy with or without exceptions. Additional insurance will be issued at the full published rate. This provision does not apply to refinances or equity line loans.

In computing a reissue rate on loan policies, if the former Loan Policy is one "with exceptions" and the new policy is to be "without exceptions", the rate will be figured using the "without exceptions" rates. Where the former policy is "without exceptions" and the new is "with exceptions", the reissue rate will be computed using the "with exceptions" rate.

| Effective Date of Existing Policy | Percent Credit |
|---|---|
| Less than 3 years old | 40% |
| 3 years to 5 years | 20% |
| over 5 years | 10% |

## VI.   LIMITED COVERAGE RESIDENTIAL LOAN POLICIES

The Limited Coverage Loan Policy is designed for one to four family residential properties. This policy is an ALTA Loan Policy (10/21/87) with additional standard exceptions. It is available upon request, up to a maximum amount of $150,000.00 of insurance, under the following schedule:

| Amount of Liability | Basic Rate | Amount |
|---|---|---|
| For the first $20,000.00 of liability (or fraction thereof) | minimum | $100.00 |
| For each additional $1,000.00 (or fraction thereof) to and including $50,000.00 | $2.50 | $175.00 |
| For each additional $1,000.00 (or fraction thereof) in excess of $50,000.00 and up to $150,000.00 | $2.00 | $375.00 |

Standard Exceptions for Limited Coverage Residential Loan Policy:

1.    Rights or claims of parties in possession not shown by the public records.

2.    Encroachments, overlaps, boundary line disputes, and any other matter which would be disclosed by an accurate survey and inspection of the premises.

3.    Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

4.    Easements or claims of easements not shown by the public records and existing water, mineral, oil and exploration rights.

5.    Any easements or servitudes appearing in the public records.

6.    Any lease, grant, exception or reservation of minerals or mineral rights appearing in the public records.

7.    Restrictions upon the use of the premises not appearing in the chain of title.

8.    Covenants, conditions and restrictions, if any, appearing in the public records.

9.    Taxes and special assessments which become due and payable subsequent to the date of policy or which are not shown as existing liens by the public records or by the records of any taxing authority

VII.    LIMITED LOAN COVERAGE POLICY (LLCP) FILED FORM 8230

The LLCP (Filed Form 8230, Schedule A 3301, Schedule B 3302, 3303 and 3304) was designed to provide coverage for national lenders providing second and home equity mortgages. The LLCP will be based on the amount of the loan up to one hundred fifty thousand dollars ($150,000). The premium for this policy will be a flat rate, set forth as follows:

The flat rate for this policy will be One Hundred Eighty Five Dollars ($185), which Includes one bring down for closing.

Endorsements

The LLCP will have two endorsements--a Revolving Credit/Variable Rate Endorsement, Form #3013, and a Revolving Credit/Variable Rate Extension Endorsement, Form #3014.

Endorsements issued simultaneously with the policy will be offered at no charge. For endorsements issued within 30 days after the LLCP is issued the charge will be $25. For endorsements issued between 30 days and 6 months after the LLCP is issued the charge will be $75. After six months, the customer must obtain a new LLCP at the original price.

VIIa.    ALTA RESIDENTIAL LIMITED COVERAGE JUNIOR LOAN POLICY (ALTA JR) FILED FORM 8241 & ALTA SHORT RESIDENTIAL LIMITED COVERAGE JUNIOR LOAN POLICY FILED FORM 8243

The ALTA JR and Short Form ALTA JR (filed Forms 8241 and 8343) Exceptions & Tax Information Schedule (filed Form 3225) and Addendum to Short Form, (filed Form 3226) was designed to provide coverage for national lenders providing second and home equity mortgages. The premium for this policy will be a flat rate, set forth as follows:

For up to $250. of liability                     $100.00

Endorsements

The ALTA JR and Short Form ALTA JR will have two endorsements – The ALTA endorsements Form JR 1, (filed Form 3446), Residential Limited Coverage Junior Loan Policy Supplemental Coverage and (filed Form 3443), Revolving Credit/Variable Rate to Residential Limited Coverage Junior Loan Policy.

The charge for the endorsements will be a flat fee of $40.00 each.

VIII.   ENDORSEMENTS TO OWNERS, LEASEHOLD OR LOAN POLICIES WHICH EXTEND THE EFFECTIVE DATE OF THE POLICY.

The Company may issue endorsements which extend the effective date of the policy.  There will be no charge for endorsements to loan policies as long as the amount of insurance is not increased.  If the amount of insurance is increased by said endorsements, a premium charge for the additional insurance will be made, calculated at the basic rate in effect at the time of application.  The charge for said endorsements to Owners of Leasehold Policies will be calculated as stated in Section V (reissue rates).

IX.   ENDORSEMENTS TO OWNERS LEASEHOLD OR LOAN POLICIES WHICH DO NOT EXTEND THE EFFECTIVE DATE THEREOF

The company may issue endorsements which modify the coverage of said policies, but do not extend the effective date thereof.  There will be no charge for endorsements as long as the amount of insurance is not increased.  If the amount of insurance is increased by said endorsements, a premium charge for the additional insurance will be made, calculated at the basic rate in effect at the time of application.

X.   LOAN POLICY WITH AN OWNERS POLICY ISSUED SIMULTANEOUSLY

When an Owners Policy and Loan Policy are issued simultaneously with identical effective dates, the Owners Policy will be issued, subject to the Loan Policy, at full published rates for Owners Policies.  The Loan Policy will be issued at a rate of forty percent (40%) of the basic rate for loan policies.  The minimum charge will be $190.00.  Where the Owners Policy is applied for by an operating builder on new construction, this paragraph does not apply.

XI.   MASTER POLICY INCLUDING SITE CONDOMINIUMS

A subdivider or a developer may upon request secure a blanket fee policy covering ten or more lots.  He/she may order a sub-fee policy covering individual lots at a sub-fee rate of fifty dollars ($50.00) per lot or building site at a later date.  The right to obtain a sub-fee policy under the blanket policy shall be limited to the insured or his/her immediate grantee.

Any increase in insurance required under the master policy shall be the basic rate per thousand in effect at the time of application for the increase.  No sub-policy shall be issued under a Master Policy when the aggregate amount of all sub-policies so issued exceeds the face amount of the Master Policy.

XII.   NEW CONSTRUCTION RATE

A)   When an Owners Policy is applied for by an operating builder insuring title to a one to four family dwelling, the amount of which policy is to be the value of the land and the improvements, and which is issued simultaneously with and subject to a Loan Policy:

CHICAGO TITLE INSURANCE COMPANY (II) (R 3/02)

8

(1)     The Loan Policy will be issued according to the published schedule of rates.

(2)     The Owners Policy will be issued at a rate of $25.00.

B)     When an Owners Policy is applied for by an operating builder insuring title to a one to four family dwelling, the amount of which is to be the value of the land and the improvements, which is not issued simultaneously with a Loan Policy, the policy will be issued at a charge of twenty-five percent (25%) of the basic rate, with a minimum of $190.

XIII.   SHORT TERM CONSTRUCTION OR BUILDER'S LOAN POLICY

Where a Builders Loan securing residential property is to be refinanced within one (1) year from the date of the Loan Policy, or where said Loan must be fully paid within one (1) year, notwithstanding that the mortgagor may change, a policy insuring said Builders Loan will be charged at a rate of forty (40%) percent, with a minimum of $190.  Under this provision, there is no reissue credit unless the insured loan is foreclosed.

XIV.   SHORT FORM RESIDENTIAL LOAN POLICIES

This policy incorporates by reference all of the insuring provisions, exclusions from coverage, and conditions and stipulations set forth in Form 8284 and is issued when requested by a lender on one-to-four family residential property.  The policy contains pre-printed standard exceptions and affirmative coverages which are commonly encountered in these residential transactions.

XV.   ABSTRACT CREDIT

An abstract presented and surrendered at the time of application for title insurance, certified to the property to be insured, shall receive an abstract credit.  The credit shall be one dollar per thousand ($1.00/1,000) up to a maximum credit of $100.00.  Abstracts surrendered for credit shall become the property of the insuring company or agent which issues the policy on which credit is given.

XVI.   POLICIES INSURING LAND CONTRACT INTERESTS

Individual policies may be issued insuring the respective interest of vendor and vendee in a land contract.  When both policies have an identical effective date, the charge for the Vendors Policy will be at the regular Owners Policy rate, while the charge for the vendees will be fifty dollars ($50.00).  Any such policy will contain appropriate language limiting the liability to the face amount of either policy rather than the aggregate of both policies.

XVII.   GENERAL RULES FOR EXCEPTIONS SHOWN UNDER SCHEDULE "B"
FILED FORMS 2202, 2203-34, 3149, 3354, 3518, 3520, 3526, 8284 AND 11109

The above commitment schedules are completed after the search and examination of the title to the real estate to be insured.  The exceptions will vary from parcel to parcel as will the requirements depending on the nature of the transaction.

Schedule B, Part I of the commitment generally calls for a proper deed from the fee owner, plus releases on mortgages, liens, etc.

Schedule B, Part II of the commitment generally lists any further exceptions to title.

The above policy schedules list as exceptions the standard exceptions, taxes, and other items such as deed restrictions, subdivision restrictions, recorded easements and other matters of record which affect the real estate.

CHICAGO TITLE INSURANCE COMPANY (JJ) (R 3/02)                                          9

XVIII. GENERAL RULES FOR USE OF CONTINUATION SCHEDULES FILED
FORMS 2203, 3237, 3631 AND 3505

Filed Forms 2203, 3237, 3631 and 3505 are continuations or amendments of Schedules A and B. Sometimes a legal description is too long to fit on Schedule A. Also the number of exceptions or encumbrances affecting a parcel often necessitates a Schedule B continuation.

XIX. COMMITMENT AND POLICY FORMS

| Commitment and Policy Forms | Filed Form |
|---|---|
| Commitment | 3360 |
| ALTA Owners Policy | 8296 |
| ALTA Loan Policy | 8257 |
| Short Form Residential Loan Policy | 8284 |
| Residential Owners Policy | 8263 |
| US Owners Policy | 8230 |

XX. ZONING ENDORSEMENT

Whenever a policy is issued containing ALTA ENDORSEMENT FORM 3.0, a charge of 10% of the applicable published Owners Policy or Loan Policy rate will be made. Whenever a policy is issued containing ALTA Endorsement Form 3.1 a charge of 15% of the applicable published Owners or Loan Policy rate will be assessed. A minimum of $50.00 will be charged for either endorsement.

Whenever a policy is issued containing an ALTA Endorsement Form 3.1 which includes parking under paragraph 2.(b)(V) of the endorsement, a charge of fifteen percent (15%) of the applicable published Owners or Loan Policy rate will be assessed. A minimum of one hundred dollars ($100.00) will be charged.

XXI. USURY ENDORSEMENT

The Usury endorsement is available on Loan Policies upon request, provided the rate of interest is not usurious according to the Company's analysis, and the loan documents are acceptable to the Company. The charge will be 10% of the basic rate with a $50.00 minimum charge.

XXII. REFINANCE LOAN POLICIES

When a first mortgage loan is refinanced by the same borrower, a rate equal to 50% of the Basic Rate will be charged for the full amount of the new mortgage to be insured. This rate shall not apply if the Reissue Rates set forth in Section V would result in a lower premium. The minimum charge for a policy issued under this section will be $190.00.

XXIII. GENERAL RULES FOR RESIDENTIAL TITLE INSURANCE POLICY (8263)
ALTA OWNERS POLICY (8296) AND ALTA LEASEHOLD OWNERS POLICY ENDORSEMENT

The Residential Title Insurance Policy may only be issued when insuring owners of One-To-Four Family

Residences.  The ALTA Owners Policy may only be issued when insuring owners of Non-One-To-Four-Family Residences.  The ALTA Leasehold Owners Policy Endorsement may only be issued when insuring leasehold owners of Non-One-To-Four Family Residences.

## XXIV.   POLICY AT CLOSING ENDORSEMENT (PACE)

A residential owner may request a PACE which will convert an ALTA Commitment into an Owners Policy at the closing.  The commitment is marked-up, as is standard procedure.  The endorsement deletes any requirements from the commitment, exceptions may be deleted specifically on the endorsement.  The endorsement is then placed inside the applicable Owners Policy jacket.  The closing documents must be recorded immediately.

## XXV.   ENDORSEMENTS AND APPLICABLE CHARGES

| ALTA Endorsements | Charge |
|---|---|
| MI ALTA 1 Street Assessments | NC |
| MI ALTA 2 Truth in Lending | NC |
| MI ALTA 3 Zoning | 15% of basic rate |
| MI ALTA 3.1 Zoning Improved with Parking | 15% of basic rate |
| MI ALTA 4 and 4.1 Condominium | NC |
| MI ALTA 5 and 5.1 Planned Unit Development | NC |
| MI ALTA 6 Variable Rate Mortgage | NC |
| MI ALTA 6.1 Variable Rate Mortgage | NC |
| MI ALTA 6.2 Variable Rate Negative Amortization | NC |
| MI ALTA 7 Manufactured Housing Unit | NC |
| MI ALTA 8.1 Environmental Protection Lien | NC |
| MI ALTA 8.1 Modified | NC |
| MI ALTA 8.1 Modified Fannie Mae | NC |
| MI ALTA 8.1 Modified Fannie Mae Commercial | NC |
| MI ALTA 9 Restrictions Encroachments Minerals | NC |
| MI ALTA 9.1 Restrictions Encroachments Minerals Unimproved Land | NC |
| MI ALTA 9.2 Restrictions Encroachments Minerals Improved Land | 10% of basic rate |
| MI ALTA 9M Restrictions Encroachments Minerals Modified | NC |
| MI ALTA 10 Assignment | $200.00 |
| MI ALTA 10.1 Assignment and Date Down | $300.00 |
| MI ALTA 11 Mortgage Modification | $150.00 |
| MI ALTA 12 Aggregation | NC |
| MI ALTA 13 Leasehold Loan | NC |
| MI ALTA 13.1 Leasehold Owners | NC |

| CLTA Endorsements | |
|---|---|
| MI CLTA 104.6 Assignment | NC |
| MI CLTA 104 Assignment of Beneficial Interest | NC |
| MI CLTA 103.3 Modified Easement Existing Encroachment | NC |
| MI CLTA 103.1 Easement, Damage from Use or Maintenance | 0-10% based on risk |
| MI CLTA 124.1 Shopping Center | NC |

| CCR Endorsements | |
|---|---|
| MI CCR 1 Aboriginal Antiquities | NC |

| | |
|---|---|
| MI CCR 4 Forced Removal | NC |
| MI CCR 5 Homeowners Association Assessments | NC |
| MI CCR 6 Minerals Improved | NC |
| MI CCR 7 Minerals | NC |
| MI CCR 8 Policy Modification | NC |
| MI CCR 8B Policy Modification | NC |
| MI CCR 8C Policy Modification | NC |
| MI CCR 10 Restrictions, Future Violations | NC |

**Construction Endorsements**

| | |
|---|---|
| MI Const. A Pending Disbursement A | NC |
| MI Const. B Pending Disbursement B | NC |
| MI Const. F Pending Disbursement Final | NC |

**Entity Endorsements**

| | |
|---|---|
| MI Entity 1 Fairway | 10% of basic rate |
| MI Entity 2 Fairway LLC | 10% of basic rate |
| MI Entity 3 Fairway LLP | 10% of basic rate |
| MI Entity 4 Fairway LP | 10% of basic rate |
| MI Entity 5 Mezzanine Financing | 15% of basic rate |
| MI Entity 6 Non-Imputation Loan | 10% of basic rate |
| MI Entity 7 Non-Imputation Owners | 10% of basic rate |

**Miscellaneous Endorsements**

| | |
|---|---|
| MI MISC 1 Additional Named Insured | $150.00 if issued after policy |
| MI MISC 2 Affirmative Creditor's Rights Loan | 0-15% based on risk |
| MI MISC 3 Affirmative Creditor's Rights Owners | 0-15% based on risk |
| MI MISC 4 Arbitration | NC |
| MI MISC 5 Coinsurance | NC |
| MI MISC 6 Deletion of Creditor's Rights Loan | NC |
| MI MISC 7 Deletion of Creditor's Rights Owners | NC |
| MI MISC 8 Future Insurance A | NC |
| MI MISC 9 Future Insurance B | NC |
| MI MISC 10 Loss Payable | NC |
| MI MISC 11 Me Too | NC |
| MI MISC 12 Option to Purchase A | NC |
| MI MISC 13 Option to Purchase B | NC |
| MI MISC 14A Add On Piggy Back Assignment | $.50/1000 with a $500.00 minimum |
| MI MISC 14M Add On Piggy Back Modified | $.50/1000 with a $500.00 minimum |
| MI MISC 15 Successor Insured | $150.00 if issued after policy |
| MI MISC 16 Tie In Owners | NC |

**Mortgage Endorsements**

| | |
|---|---|
| MI MORT 1 Assignment of Mortgage | NC |
| MI MORT 2 Assignment of Rents Contained in Insured Mortgage | $150.00 |
| MI MORT 4 Balloon Mortgage | NC |
| MI MORT 6 Contingent Loss-First Loss | 10% of basic rate |
| MI MORT 8 Conversion to Fixed Rate | NC |

CHICAGO TITLE INSURANCE COMPANY (II) (R 3/02)

12

| | |
|---|---|
| MI MORT 9 Date Down | NC |
| MI MORT 10 Discharge No Loss of Priority | $50.00 |
| MI MORT 11 Doing Business | NC |
| MI MORT 13 HUD Conversion | NC |
| MI MORT 14 Insurance For Less than Mortgage Amount | NC |
| MI MORT 15 Land Division Act | NC |
| MI MORT 16 Last Dollar | NC |
| MI MORT 17 Last Dollar Revolving Credit | 10% of basic rate |
| MI MORT 18 Letter of Credit | NC |
| MI MORT 19 Maximum Actual Loss | 1-10% based on risk; $250.00 minimum |
| MI MORT 20 Modification of Loan I | 5% of basic rate, $100.00 minimum |
| MI MORT 21 Modification of Loan II | $150.00 |
| MI MORT 23 Mortgage Assumption | NC |
| MI MORT 24 Reverse Mortgage | 10% of basic rate |
| MI MORT 25 Revolving Credit Obligatory Advance | 10% of basic rate |
| MI MORT 26 Share of Cash Flow | 10% of basic rate |
| MI MORT 27 Shared Appreciation A | 10% of basic rate |
| MI MORT 28 Shared Appreciation B | 10% of basic rate |
| MI MORT 29 Usury | 10% of basic rate |
| MI MORT 30 Variable Rate Increase Principal Indebtedness | NC |

**Survey Endorsements**

| | |
|---|---|
| MI SURVEY 1 Access Easement | NC |
| MI SURVEY 2 Access Street | NC |
| MI SURVEY 3 Contiguity | NC |
| MI SURVEY 4 Denial of Right to Maintain Existing Improvements | 0-15% based on risk |
| MI SURVEY 5 Encroachment From Adjoining Land | NC |
| MI SURVEY 6 Encroachment Onto Adjoining Land | NC |
| MI SURVEY 7 Foundation II | 0-10% based on risk |
| MI SURVEY 8 Land Delineated on Survey | NC |
| MI SURVEY 9 Location II | NC |
| MI SURVEY 10 Location III (Dimensions) | NC |
| MI SURVEY 11 Tax Deed Extinguishing Easement | NC |
| MI SURVEY 12 Tax Parcel ID | NC |
| MI SURVEY 13 Utility Facility | NC |

## XXVI.   MICHIGAN DEPARTMENT OF TRANSPORTATION RATES

The following are the schedule of rate for title insurance commitments and policies relating to real estate acquired or disposed of by the Michigan Department of Transportation (MDOT) which form of policy, when issued, will be the 1992 ALTA Owner's Policy (10-17-92).  The owner's policy of title insurance will not be issued for less than the full value of the title interest being insured.

A.   One preliminary title commitment for title insurance plus two interim commitments for title insurance to update title provided that title to all the land to be insured is vested in the same owner and the commitment is for a policy in the amount of $10,000.00                                                           $150.00

   B.   Additional interim commitment for title insurance to update title           $25.00

C.   Owner's Policies of Title Insurance

| | |
|---|---|
| For the first $10,000.00 of liability (or fraction thereof) | $120.00 |
| For each additional $1,000.00 of liability (or fraction thereof) up to and including $50,00.00 | $5.00 |
| For each additional $1,000.00 of liability (or fraction thereof) up to and including $100,000.00 | $4.00 |
| For each additional $1,000.00 of liability (or fraction thereof) up to and including $200,000.00 | $3.50 |
| For each additional $1,000.00 of liability (or fraction thereof) up to and including $300,000.00 | $3.00 |
| For each additional $1,000.00 of liability (or fraction thereof) up to and including $1,000,000.00 | $2.50 |
| For each additional $1,000.00 of liability (or fraction thereof) up to and including $4,000,000.00 | $2.00 |
| For each additional $1,000.00 of liability (or fraction thereof) up to and including $5,000,000.00 | $1.50 |
| For each additional $1,000.00 of liability (or fraction thereof) in excess of $5,000,000.00 | $1.00 |

The amount charged under Section A will be credited against the Basic Rate to the extent a credit can be applied when a policy is ordered on land to which the preliminary commitment applies.


XXVII.  ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (Form 8277), ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY

| | |
|---|---|
| For the first $11,000 of liability (or fraction thereof) | $200.00 |
| For each additional $1,000.00 (or fraction thereof) Up to and including $50,000.00 | $4.40 |
| For each additional $1,000.00 (or fraction thereof) In excess of $50,000.00 and up to $100,000.00 | $3.30 |
| For each additional $1,000.00 (or fraction thereof) In excess of $100,000.00 and up to $300,000.00 | $2.75 |
| For each additional $1,000.00 (or fraction thereof) In excess of $300,000.00 and up to $4,000,000.00 | $2.20 |
| For each additional $1,000.00 (or fraction thereof) In excess of $4,000,000.00 and up to $5,000,000.00 | $1.65 |
| For each additional $1,000.00 (or fraction thereof) | |

CHICAGO TITLE INSURANCE COMPANY (II) (R 3/02)

In excess of $5,000,000.00                                                $1.10

## XXVIII. MASTER HOME EQUITY LOAN POLICY RATE (MHELP)

I.  The Master Home Equity Loan Policy (Form 8276) is used by lenders to streamline the policy issuing process. Instead of issuing separate policies for each transaction, one master policy is issued to the lender for multiple transactions.  A confirmation notice identifying the specific loan transaction is issued by the company for each loan.

The premium for a Master Home Equity Loan Policy is:

    Coverage amount for $0 to $100,000.00=$100.00

II.  The Master Home Equity Loan Policy—NLS (Form 8280) is used by lenders to streamline the policy issuing process.  Instead of issuing separate policies for each transaction, one master policy is issued to the lender for multiple transactions.  A confirmation notice identifying the specific loan transaction is issued by the company for each loan.

For home equity loan transactions up to $250,000.00 with centralized order tracking and processing through Chicago Title's Lender's Solution or similar unit, pursuant to a written agreement, the rate shall be $120.00.

For home equity loan transactions up to $250,000.00 with centralized order tracking and processing through Chicago Title's Lender's Solution or similar unit, pursuant to a written agreement, where flood certification, appraisal, credit information and title services are obtained from Chicago Title Insurance Company, the rate shall be $90.00

## XXVIX. EXTRAORDINARY RISK FEE

When the land to be insured is located in a county where there is a recording delay at the local Register of Deeds Office, an extraordinary work fee may be assessed according to the following schedule:

| Recording Delay | Fee |
| --- | --- |
| Less than one week | 1% of Premium |
| One to two weeks | 1.5% |
| Two to four weeks | 2% |
| Four to eight weeks | 2.5% |
| Eight to twelve weeks | 3% |
| More than twelve weeks | 4% |

## XXX. FREDDIE MAC RESIDENTIAL REFINANCE RATE

Freddie Mac residential refinance loans initiated and coordinated by a Lenders Solution Center, with centralized electronic order processing and tracing capacity, serving as the central point of entry and contact with originating lenders:

| Policy Amount | Rate |
| --- | --- |
| $0.00-$100,000 | $393.00 |
| $100,001-$175,000 | $506.00 |

CHICAGO TITLE INSURANCE COMPANY (II) (R 3/02)                              15

| | |
|---|---|
| $175,001-$260,000 | $649.00 |
| $260,001-$375,000 | $820.00 |
| $375,001-$500,000 | $1009.00 |
| $500,001-$650,000 | $1205.00 |

Community Reinvestment Act (Federal CRA Program):
The above Freddie Mac Refinance Rates may be discounted by 5% if the land that is refinanced is located in an area designated under the above act.

# EXHIBIT 8



T'S HERE.
AND IT'S BU
SUIT YOU.



⊕ SUBSCRIBE   |   ⊕ E-MAIL NEWS UPDATE   |   ⊕ CONTACT US   |   ⊕ PRODUCTS

FREE EMAIL NEWS:        SEARCH: : ADVANCED SEARCH :

Current Edition

Archives

Daily News

Headline News
Legislative News
The Blotter

Issue Categories

Feature Stories
Federal News
Regulatory News
State Bill Track
Case Law

Resources

People on the Move
Special Reports
Products
Special Offers
E-Mail News Updates
Events

About TLD

Contact Us
Advertising
My Account

Home





GOOD THINGS COME IN
SIMPLE
PACKAGES



OLD REPUBLIC
Title Insurance Group

July 7, 2005

## HUD settles RESPA violation charges with Metropolitan Title

🖅 E-Mail This Article
🖶 Printer-Friendly Version

The Department of Housing and Urban Development announced on July 7 a legal settlement with a Detroit title company for violations of the Real Estate Settlement Procedures Act (RESPA).

HUD determined that Metropolitan Title Company paid real estate brokers for the use of conference rooms at rates substantially higher than their fair market value in violation of RESPA's anti-kickback provisions. While charging room rental fees does not necessarily violate RESPA, HUD found that the excessive payments made in this case were designed to disguise referral fees that the law prohibits.

Metropolitan Title was acquired by the First American Corp. in 2003, but has continued to operate as its own brand.

Section 8 of RESPA prohibits a person from giving or accepting anything of value in exchange for the referral of settlement service business. It also prohibits a person from giving or accepting any part of a charge for services that are not actually performed.

"A referral fee by any other name is still a referral fee," said **Brian Montgomery**, Assistant Secretary for Housing-Federal Housing Commissioner. "HUD will vigorously enforce the law to protect consumers from those who attempt to artificially inflate the cost of buying or refinancing a home."

In this case, HUD determined that Metropolitan Title Company paid up to $150 an hour to lease conference rooms from real estate brokers even though Metropolitan's offices were available and convenient — in some cases, just three blocks away. HUD's RESPA investigators researched the general market value of conference facilities in the Detroit area and found the average hourly rental of comparable rental space was much lower than what First American paid.

Metropolitan agreed to a $150,000 settlement payment to the U.S. Treasury and that all future office lease agreements conform to standard commercial leases. In the future, Metropolitan agreed that it would pay settlement service providers rental rates at the minimum level of the general market value for equivalent space.

PLAINTIFF'S
EXHIBIT
8

PENGAD-Bayonne, N. J.

Thursday, January 25, 2007

# First American agrees to $10 million settlement

## Regulator accused it of paying kickbacks for referrals in case similar to 2005 settlements.

By ANDREW GALVIN
The Orange County Register

**First American Title Insurance Co.** has agreed to pay $10 million to settle allegations by the California Department of Insurance that its employees paid illegal kickbacks to real estate professionals and a builder for referrals of title insurance business.

The latest settlement comes nearly two years after First American agreed in February 2005 to refund $24 million to customers to settle similar allegations brought by Colorado regulators. Later that year, the Santa Ana-based insurer agreed to pay another $5 million to California in penalties and investigative costs.

The 2005 settlements resolved what regulators described as schemes in which kickbacks were paid through phony "reinsurance" companies controlled by builders, lenders and brokers.

The new case involves accusations of less-sophisticated wrongdoing: offering inducements like concert and football tickets, riverboat cruises and payments in exchange for customers.

While it's legal for builders, lenders and real-estate agents to refer buyers to a title insurer, the insurers are barred by state and federal law from paying for such referrals.

The latest settlement, dated Jan. 3, was reported Wednesday by Inman.com, a real estate news site. First American didn't admit wrongdoing in the settlement.

In a statement, First American said "this action is in keeping with First American's previously announced plan to meet with insurance regulators across the nation, to proactively share the details of its corporate compliance program and address and resolve all pre-existing compliance matters."

According to documents posted on the California Department of Insurance's Web site, the department received written complaints between February and December 2005 "from persons concerned about illegal rebating activities implemented and conducted by First American."

On June 1, 2003, First American agreed to pay **Frontier Homes LLC**, a builder, $100 for each closed First American title insurance order from homebuyers referred by Frontier in Riverside, San Bernardino and Los Angeles counties, according to the case documents. Between July 21, 2003 and Aug. 3, 2006, First American made 15 payments to Frontier Homes for a total of $106,000, according to the documents.

In addition, First American employees sought reimbursement for $265,490 worth of gifts, meals, event tickets and other inducements to builders and other real estate professionals, the documents show.

**Contact the writer:** 714-796-6045 or agalvin@ocregister.com

HUD settles RESPA case against four Detroit real estate brokers who allegedly accepted ...

Case 2:06-cv-00789-RAE   ECF No. 48-4 filed 05/25/07   PageID.330   Page 40 of 65

## HUD settles RESPA case against four Detroit real estate brokers who allegedly accepted kickbacks from Metropolitan Title

October 31, 2005

The Department of Housing and Urban Development today announced separate settlement agreements totaling $80,000 with four Detroit area real estate brokers for violations of the Real Estate Settlement Procedures Act (RESPA). The settlements announced today follow a related agreement this summer with Metropolitan Title Company which HUD determined paid these real estate brokers for the use of conference rooms at rates substantially higher than their fair market value.

HUD reached agreements with the following real estate brokers in the Detroit area: RE/MAX Masters; RE/MAX in the Hills; Hometown One Associates (doing business as Remerica Hometown One); and, Schweitzer Real Estate, Inc. (doing business as Coldwell Banker Schweitzer Real Estate). In each case, HUD determined that these brokers received conference room rental fees from Metropolitan in excess of the general market rate for comparable room rentals.

While charging or paying room rental fees does not necessarily violate RESPA, the excessive charges and payments made in these circumstances were designed to disguise referral fees that violate the anti-kickback provisions of law. Section 8 of RESPA prohibits a person from giving or accepting anything of value in exchange for the referral of settlement service business.

"Whether you give or whether you receive a thing of value in exchange for the referral of business, it's against the law," said **Brian Montgomery**, Assistant Secretary for Housing-Federal Housing Commissioner. "RESPA speaks to both sides of this equation and HUD, for its part, will vigorously enforce the law when it comes to controlling kickbacks, whether you pay or whether you're paid."

Last July, HUD reached a settlement with Metropolitan Title Company for paying excessive hourly rates to lease conference rooms from real estate brokers. HUD investigators researched the general market value of conference facilities in the Detroit area and found the average hourly rental of comparable rental space was much lower than what Metropolitan paid to these brokers.

HUD determined that Metropolitan Title Company paid real estate brokers for the use of conference rooms at rates substantially higher than their fair market value in violation of RESPA's anti-kickback provisions. While charging room rental fees does not necessarily violate RESPA, HUD found that the excessive payments made in this case were designed to disguise referral fees that the law prohibits.

Metropolitan Title was acquired by the First American Corp. in 2003, but has continued to operate as its own brand.

The settlement agreement accused Metropolitan of violating both Section 8(a) of RESPA as well as HUD's Statement of Policy 1996-3, *Rental of Office Space, Lockouts and Retaliation.* SOP 1996-3 sets forth the factors that HUD uses to determine whether conference room rental agreements between settlement service providers are legitimate room rentals, or whether they constitute illegal kickbacks for referrals of settlement services.

In this case, HUD determined that Metropolitan Title Company paid up to $150 an hour to lease conference rooms from real estate brokers even though Metropolitan's offices were reportedly available and convenient — in some cases, just three blocks away.

HUD's RESPA investigators researched the general market value of conference facilities in the Detroit area and found the average hourly rental of comparable rental space was much lower than what First American paid.

Following the investigation of Metropolitan, HUD then pursued real estate brokers who benefited from these payments.

The four real estate brokers agreed to make the following payments to the U.S. Treasury as a result of the settlements announced today:

RE/MAX Masters: $8,000
RE/MAX in the Hills: $12,000
Remerica Hometown One: $15,000
Coldwell Banker Schweitzer: $45,000

Copyright © 2005 October Research Corp. All rights Reserved.

## SETTLEMENT AGREEMENT

### RECITALS

This Settlement Agreement is made and entered into between the U.S. Department of Housing and Urban Development ("HUD" or "Department"), and First American Title Insurance Company d.b.a. Memphis Title Company ("First American") with a principal place of business located at 6465 Quail Hollow, Suite 300, Memphis, TN 38120 (collectively the "Parties").

WHEREAS, the Secretary of Housing and Urban Development is authorized to enforce the Real Estate Settlement Procedures Act of 1974 ("RESPA" or "the Act"), 12 U.S.C. § 2601 *et seq.*, and its implementing regulations (the "regulations"), 24 C.F.R. § 3500 *et seq.*; and

WHEREAS, the Secretary is authorized by Section 19 of RESPA to investigate any facts, conditions, practices, or matters deemed necessary to determine whether any person has violated or is about to violate any provision of the Act or any rule or regulation prescribed pursuant thereto; and

WHEREAS, Section 8(a) of RESPA, 12 U.S.C. § 2607(a), prohibits the giving or receiving any fee, kickback or thing of value pursuant to an agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person; and

WHEREAS, Section 8(b) of RESPA prohibits the giving or accepting of any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed; and

WHEREAS, 24 CFR 3500.14 sets forth the implementing regulations for RESPA Sections 8(a) and 8(b) and 24 CFR 3500.15 sets forth requirements for affiliated business arrangements; and

WHEREAS, HUD's Statement of Policy 1996-2 sets forth the factors that the Department uses to determine whether a controlled business arrangement is a sham under RESPA or whether it constitutes a bona fide provider of settlement services; and

WHEREAS, First American is a provider of title and settlement services involving federally related mortgage loans in or about Memphis, Tennessee; and

WHEREAS, the Department has conducted a formal federal investigation of First American concerning possible violations of Sections 8(a) and (b) of RESPA, and

WHEREAS, following this investigation, the Department determined that:

(A)    On or about January 1, 2002, or subsequent to January 1, 2002, First American acquired controlling interests in the following limited liability companies: Title Group I, LLC; Title Group II, LLC; Title Group III, LLC; Title Group IV, LLC; Title Group VI, LLC, Title Group VII, LLC; Title Group VIII, LLC; and Landmark Title, LLC (collectively "Title Groups"). Various builders, real estate agents, and mortgage brokers compose the minority ownership interests in the Title Groups.

(B)    First American allowed the Title Groups to lease at least two First American employees who were responsible for providing title services for the Title Groups. Additionally, First American allowed the Title Groups to rent space at its office and use its computer services.

(C)    Little or no title work was provided by the Title Groups, and settlement services purported to be provided by the Title Groups were essentially provided by First American.

(D)     The Title Groups are not independent business entities, are considered sham controlled business arrangements under RESPA and thus, are not bona fide providers of settlement services.

(E)     The builders, real estate agents, and mortgage brokers with ownership interests in the Title Groups received substantial financial benefits from the referral of business to the Title Groups.

(F)     First American received nearly $680,000 in financial benefits arising from its ownership interest in the Title Groups between May 2002 and December 2004.

**WHEREAS** based upon the results of its investigation, HUD determined that First American violated RESPA and the regulations, and/or aided and abetted others in violation of the Act and regulations, with respect to practices described above; and

**WHEREAS** First American has voluntarily caused the Title Groups to cease their business activities; and

**WHEREAS** the Parties agree that this Settlement Agreement constitutes the settlement of disputed claims between the Parties, including claims under the Act and regulations; and

**WHEREAS** the Settlement Agreement shall not constitute an admission of wrongdoing, liability, or legal fault on the part of First American for any conduct underlying this Settlement Agreement, nor shall it be construed as an admission that any person or entity acted wrongfully; and

**WHEREAS** the Parties desire to avoid formal proceedings, any further expense, and to finally resolve this matter under the terms and conditions set forth below; and

**WHEREAS** the terms of this Settlement Agreement are an appropriate disposition of this case and are in the public interest;

NOW, THEREFORE, in consideration of the mutually negotiated promises, covenants, and obligations in this Settlement Agreement, the Parties reach a final settlement as set forth below:

## AGREEMENTS

1.    This Settlement Agreement is effective on the date of signature of the last signatory to the Settlement Agreement (hereinafter the "Effective Date"). The provisions of this Settlement Agreement apply only to the operations of First American in Shelby County, Tennessee (the county in which Memphis is located).

2.    Based on First American's compliance with this Settlement Agreement, the Department will terminate its investigation of First American; and HUD agrees to take no further enforcement action under RESPA against First American, its shareholders, directors, officers, and employees, with respect to the practices described herein, or for which the Department received information about during this investigation, unless such practices recur.

3.    First American hereby waives, releases, and remits any and all claims, directly or indirectly, against the Department, or any of its employees, agents, or representatives, with respect to HUD's investigation or this Settlement Agreement.

4.    First American agrees hereafter to fully comply with all provisions of RESPA and its implementing regulations, and conduct its business in a manner consistent with the Department's RESPA policy statements.

5.    Within thirty (30) business days of the Effective Date, First American shall make a settlement payment totaling six hundred eighty thousand dollars ($680,000), payable to the United States Treasury, and delivered to counsel for HUD.

4

6.    Within forty-five (45) business days of the Effective Date, First American will withdraw from all Title Groups as both a member and/or manager and cease all operations with the Title Groups.

7.    At all times in the future, any title entities formed, owned or operated by First American, or in which First American has any interest, will be operated in accordance with the following terms:

a.    Each title entity will have sufficient initial and operating capital and net worth to conduct the settlement service for which it was created.

b.    Return on ownership interest to each owner shall be proportional to the percentage of that party's capital contribution.

c.    Each title entity will be staffed with employees who work only for that entity, and who are not shared with any other title entity, builder, real estate agent, mortgage broker, or other settlement service provider.

d.    Each title entity will manage its own business affairs and will not be managed or controlled by any other entity or person, except that First American and other owners of such an entity shall be entitled to exercise the ownership and control typical for owners of a business entity.

e.    Each title entity will have an office for its use in conducting business that is separate and apart from that of any other title entity.

f.    Each title entity will pay fair market value for the facilities that it occupies and uses in its business.

g.    Each title entity will comply with HUD Policy Statement 1996-4 with regard to the performance of and payment for title services.

5

h.   Each title entity will actively compete in the marketplace for title insurance business, and will actively seek business from parties other than the builders, real estate agents, and mortgage brokers, or other settlement service providers with which it has had an affiliate relationship.

i.   Each title entity will refrain from business practices that provide unearned fees or kickbacks in return for the referral of settlement service business.

8.   First American agrees to cooperate with any HUD investigations of settlement service providers, including but not limited to the other members/managers of the Title Groups.

9.   The agreement to comply with RESPA undertaken in the above paragraphs 1-8 will apply to all of First American's business ventures in Shelby County, Tennessee.

10.   Should First American fail to comply with the terms set out above, or should any of its representations prove to be false or incomplete in any material manner, HUD may take appropriate enforcement action, and/or refer the matter to other governmental authorities for further action.

11.   This Settlement Agreement constitutes the complete agreement between the Parties as to the matters addressed herein. This Settlement Agreement may not be amended except by written consent of the Parties.

12.   By entering into and performing its obligations under this Settlement Agreement, First American does not admit any liability to HUD or any other person or entity. First American denies any liability or violation of RESPA and the implementing regulations. This Settlement Agreement is entered into solely to compromise and to settle disputed matters.

13.   Each of the Parties to this Settlement Agreement shall bear its own attorney's fees and costs, including the preparation and performance of this Settlement Agreement.

6

14.     This Settlement Agreement applies to and binds First American and its respective predecessors, successors, directors, officers, principals, employees, representatives, and assigns. Provided, however, that First American shall be entitled to relief from the provisions of Paragraph 7 in order to engage in conduct permitted by any potential amendments to RESPA, Section 8 of RESPA or provisions of Regulation X interpreting and applying section 8 of RESPA.

15.     The Parties represent that this Settlement Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever. No provision of this Settlement Agreement shall be construed against any party by reason of such party having drafted such provision of the Settlement Agreement.

16.     By this Settlement Agreement the Parties do not waive, compromise, or release any claims or causes of action against any other person or entity not expressly released by this Settlement Agreement.

17.     Failure by any Party to enforce any provision of this Settlement Agreement shall not be construed as a waiver by such Party of any provision, nor in any way affect the validity of this Settlement Agreement or any part thereof.

18.     If any provision of this Settlement Agreement is determined to be invalid or unenforceable for any reason, then such provision shall be treated as severed from the remainder of this Settlement Agreement and shall not affect the validity and enforceability of all the other provisions of this Settlement Agreement as long as such severance does not materially change the Parties' rights and obligations.

19.     This Settlement Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute on and the same agreement.

20.     Each person who signs this Settlement Agreement in a representative capacity warrants that his or her execution of this Settlement Agreement is duly authorized, executed, and delivered by and for the entity for which he or she signs.

**On Behalf of First American Title Insurance Company,
d.b.a. Memphis Title Company:**

_____   July 1, 2005
Signature                          Date

James J. Dufficy
_____
Print Name

Senior Vice President, Regulatory Counsel
_____
Title

**On Behalf of the U.S. Department of Housing and Urban Development:**

_____   7/8/05
Brian D. Montgomery                Date
Assistant Secretary for Housing-Federal
 Housing Commissioner

8

# STEPHANIE EGERER DECLARATION

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN EGERER, et al.,

             Plaintiffs,                        Case No.: 1:06cv0789

             v.

WOODLAND REALTY, INC., et al.,                Hon. Richard A. Enslen

             Defendants.                 Hon. Ellen S. Carmody

_____/

## DECLARATION OF STEPHANIE EGERER

My name is Stephanie Egerer, and I have personal knowledge of the facts contained in this Declaration.

1.      On June 14, 2004, my husband and I attended a closing to sell our home that was located at 18177 Yuma Court in Ferrysburg, Michigan to another family.

2.      At some point prior to the June 14, 2004 closing, I recall that our Woodland Realty, Inc. ("Woodland Realty") agent recommended to us that we use the services of an entity called Woodland Title Agency, LLC ("Woodland Title") to conduct the closing on our home.

3.      I trusted the recommendation of Woodland Realty to use Woodland Title for real estate settlement services, and I expected that the recommendation was made with our best interests in mind, and that the recommendation was not made because an illegal financial gain or benefit was being paid or received by any party.

4.      For the closing appointment on June 14, 2004, we were directed by Woodland Realty to go to the offices of a Chicago Title company on Robbins Road in Grand Haven, Michigan.  Nobody at the Chicago Title office ever mentioned an entity called "Woodland

Title," I saw no signs, nameplates, advertising materials, or any indication at this office of an entity named "Woodland Title." Among the myriad pieces of paper placed in front of us by the Chicago Title employee during the closing, I did not notice any reference to "Woodland Title," nor was there any explanation given to me at the closing regarding any involvement of Woodland Title. We understood that the person performing all of our real estate settlement services was a Chicago Title employee. I have never seen any evidence that Woodland Title provided any service or benefit to us in connection with the closing.

5.      Prior to September 2006, I did not know that Woodland Realty, Woodland Title and Chicago Title companies were paying and receiving illegal financial benefits to realtors to encourage them to recommend the services of Woodland Title and Chicago Title companies.

6.      Had I known that Woodland Realty, Woodland Title and Chicago Title companies were engaging in illegal activity to obtain our real estate settlement services business, I would not have agreed to work with them.

I swear under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.


Dated: _____        _____
                                  Stephanie Egerer

Title, I saw no signs, nameplates, advertising materials, or any indication at this office of an entity named "Woodland Title." Among the myriad pieces of paper placed in front of us by the Chicago Title employee during the closing, I did not notice any reference to "Woodland Title," nor was there any explanation given to me at the closing regarding any involvement of Woodland Title. We understood that the person performing all of our real estate settlement services was a Chicago Title employee. I have never seen any evidence that Woodland Title provided any service or benefit to us in connection with the closing.

5. Prior to September 2006, I did not know that Woodland Realty, Woodland Title and Chicago Title companies were paying and receiving illegal financial benefits to realtors to encourage them to recommend the services of Woodland Title and Chicago Title companies.

6. Had I known that Woodland Realty, Woodland Title and Chicago Title companie were engaging in illegal activity to obtain our real estate settlement services business, I would not have agreed to work with them.

I swear under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: 2/11/07            Stephanie Egerer
                          Stephanie Egerer

BOYINK DECLARATION

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN EGERER, et al.,

        Plaintiffs,                         Case No.: 1:06cv0789

        v.

WOODLAND REALTY, INC., et al.,               Hon. Richard A. Enslen

        Defendants.                     Hon. Ellen S. Carmody

_____/

## DECLARATION OF KATHY BOYINK

    My name is Kathy Boyink, and I have personal knowledge of the facts contained in this Declaration.

    1.      On September 6, 2005, I attended a closing to purchase a home that was located at 1144 Slayton Street in Grand Haven, Michigan.

    2.      At some point prior to the closing, I recall that my real estate agent instructed me to appear on September 6, 2005 at the offices of Chicago Title on Robbins Road in Grand Haven, Michigan, to conduct the closing on the purchase of this home.

    3.      I assumed that the selection of Chicago Title to perform settlement services was made with my best interests in mind, and that the recommendation was not made because an illegal financial gain or benefit was being paid or received by any party.

    4.      At the closing appointment on September 6, 2005, nobody at the Chicago Title office ever mentioned an entity called "Woodland Title," I saw no signs, nameplates, advertising materials, or any indication at this office of an entity named "Woodland Title." Among the myriad pieces of paper placed in front of us by the Chicago Title employee during the closing, I

did not notice any reference to "Woodland Title," nor was there any explanation given to me at the closing regarding any involvement of Woodland Title. I understood that the person performing all of our real estate settlement services was a Chicago Title employee. I have never seen any evidence that Woodland Title provided any service or benefit to me in connection with the closing.

5.      Prior to September 2006, I did not know that Woodland Realty, Woodland Title and Chicago Title companies were paying and receiving illegal financial benefits to realtors to encourage them to recommend the services of Woodland Title and Chicago Title companies.

6.      Had I known that Woodland Realty, Woodland Title and Chicago Title companies were engaging in illegal activity to obtain our real estate settlement services business, I would not have agreed to work with them in connection with my settlement services business.

7.      Attached as Exhibit 10 is a true and accurate copy of the HUD-1 Statement related to the closing on my home.

8.      Attached as Exhibit 11 is a true and accurate copy of an invoice from Woodland Title and Chicago Title of Michigan, Inc. that I found among the papers in my closing packet.

I swear under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: 5/25/07          Kathy Boyink
                        Kathy Boyink

# EXHIBIT 10

Chicago Title                                          Apr 4 2007 17:35   P.32

| A. | | | | | OMB NO. 2502-0265 |
|---|---|---|---|---|---|

**U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT**

**SETTLEMENT STATEMENT**

B. TYPE OF LOAN:

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |
|---|---|---|---|---|

6. FILE NUMBER: 700385224WTA

7. LOAN NUMBER: 105420539

8. MORTGAGE INS CASE NUMBER:

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

14 3/88  (700385224WTA.PK0/700385224WTA/16)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| Kathy Lynn Boyink<br>1144 Slayton<br>Grand Haven, MI 49417 | Jeremy Walter | The Bank of Holland<br>150 Central Avenue<br>Holland, MI 49423 |

| G. PROPERTY LOCATION:<br>1144 Slayton<br>Grand Haven, MI 49417<br>Ottawa County, Michigan | H. SETTLEMENT AGENT: 38-1997202<br>Chicago Title of Michigan<br><br>PLACE OF SETTLEMENT<br>17040 Robbins Road<br>Grand Haven, MI 49417 | I. SETTLEMENT DATE:<br><br>October 6, 2005 |
|---|---|---|

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 126,500.00 | 401. Contract Sales Price | 126,500.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 2,508.86 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes       to | | 406. City/Town Taxes       to | |
| 107. County Taxes       to | | 407. County Taxes       to | |
| 108. Assessments       to | | 408. Assessments       to | |
| 109. Tax Proration | 107.38 | 409. Tax Proration | 107.38 |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 131,116.25 | **420. GROSS AMOUNT DUE TO SELLER** | 126,607.38 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | 500.00 | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 102,800.00 | 502. Settlement Charges to Seller (Line 1400) | 9,892.92 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff First Mortgage to Chase Home Finance/10-196 | 95,604.85 |
| 205. | | 505. Payoff Second Mortgage to Communications Family Cr | 11,908.34 |
| 206. | | 506. | |
| 207. | | 507. (Deposit disb. as proceeds) | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes       to | | 510. City/Town Taxes       to | |
| 211. County Taxes       to | | 511. County Taxes       to | |
| 212. Assessments       to | | 512. Assessments       to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 103,300.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 117,406.11 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 131,116.25 | 601. Gross Amount Due To Seller (Line 420) | 126,607.38 |
| 302. Less Amount Paid By/For Borrower (Line 220) | (103,300.00) | 602. Less Reductions Due Seller (Line 520) | (117,406.11) |
| **303. CASH ( X FROM) ( TO ) BORROWER** | 27,816.25 | **603. CASH ( X TO ) ( FROM ) SELLER** | 11,201.27 |

By signing page 2 of this statement, the signatories acknowledge receipt of a completed copy of page 1 of this two page statement.

CT 0101

EXHIBIT

Plf 10   4-26-07

Kossen

PENGAD 800-631-6989

Printed: 10/04/05 at 10:20 AM                    HUD-1 (3-86) RESPA, HB4305.2

Page 2

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** $ 128,500.00 @ 6.0000 % 7,710.00 | | | |
| Division of Commission (line 700) as Follows: | | | |
| 701. $ 3,855.00 to Woodland Realty-Grand Haven | | | |
| 702. $ 3,855.00 to Prins Real Estate | | | |
| 703. Commission Paid at Settlement | | | 7,710.00 |
| 704. Woodland Fee | to Woodland Realty | | 190.00 |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee % to | | | |
| 802. Loan Discount % to | | | |
| 803. Appraisal Fee | to Great Lakes Appraisals | 150.00 | |
| 804. Credit Report | to Equifax Mortgage Services | 14.33 | |
| 805. Lender's Inspection Fee | to | | |
| 806. Mortgage Ins. App. Fee | to | | |
| 807. Assumption Fee | to | | |
| 808. Flood Certification | to Landsafe | 18.00 | |
| 809. Funding Fee | to Countrywide Home Loans | 150.00 | |
| 810. Mortgage Broker Fee | to The Bank of Holland from Countrywide POC $1,552.26 | | |
| 811. Tax Service Fee | to Countrywide Home Loans | 65.00 | |
| 812. Processing Fee | to The Bank of Holland | 150.00 | |
| 813. Underwriting Fee | to The Bank of Holland | 60.00 | |
| 814. Automated Underwriting Fee | to FNMA | 15.00 | |
| 815. | | | |
| 816. | | | |
| 817. | | | |
| 818. | | | |
| 819. | | | |
| 820. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From 10/06/05 to 11/01/05 @ $ 16.550000/day ( 26 days %) | | 430.30 | |
| 902. Mortgage Insurance Premium for months to | | | |
| 903. Hazard Insurance Premium for 1.0 years to Meemic | POC $360.00b | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard Insurance | months @ $ per month | | |
| 1002. Mortgage Insurance | months @ $ per month | | |
| 1003. City/Town Taxes | 6.000 months @ $ 126.85 per month | 761.10 | |
| 1004. County Taxes | 13.000 months @ $ 30.00 per month | 390.00 | |
| 1005. Assessments | months @ $ per month | | |
| 1006. | months @ $ per month | | |
| 1007. | months @ $ per month | | |
| 1008. Aggregate Adjustment | months @ $ per month | -210.00 | |
| **1100. TITLE CHARGES** | | | |
| 1101. Closing Fee | to Chicago Title Insurance Company | 130.00 | 130.00 |
| 1102. Abstract or Title Search | to Chicago Title of Michigan | | |
| 1103. Title Examination | to Chicago Title of Michigan | | |
| 1104. Title Insurance Binder | to Chicago Title of Michigan | | |
| 1105. Document Preparation | to Chicago Title of Michigan | | |
| 1106. Notary Fees | to Chicago Title of Michigan | | |
| 1107. Attorney's Fees | to | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance | to Chicago Title Insurance Company | 258.20 | 663.25 |
| (includes above item numbers: ) | | | |
| 1109. Lender's Coverage | $ 102,500.00 256.20 | | |
| 1110. Owner's Coverage | $ 128,500.00 663.25 | | |
| 1111. Mail/Overnight & Handling Fee | to Chicago Title Insurance Company | 20.00 | |
| 1112. Wire Fee | Chicago Title Insurance Company | | |
| 1113. Recording Handling Fee | to Chicago Title Insurance Company | 20.00 | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees: Deed $ : Mortgage $ 83.00: Releases $ | | 83.00 | |
| 1202. City/County Tax/Stamps: Deed 141.35; Mortgage | | | 141.35 |
| 1203. State Tax/Stamps: Deed 963.75; Mortgage | | | 963.75 |
| 1204. MERS Registration | to MERS | 3.95 | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey | to | | |
| 1302. Pest Inspection | to | | |
| 1303. Utilities | to Board of Light and Power | | 29.85 |
| 1304. Water/Sewer | to Grand Haven City Treasurer | | 64.72 |
| 1305. | | | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | 2,508.68 | 9,892.92 |

CT 0102

# EXHIBIT 11

Woodland Title Agency, LLC
466 E. 16th Ave
Holland, MI 49423
Phone: (616)355-3627
Fax: (616)355-3634

odlandTitle

---

### INVOICE

Account: **70BOH01001**

Don Timlowski

Date: **September 21, 2005**
File Number: **700385224WTA**
Cust. Ref.: **105420539**

Property Address: **1144 Slayton, Grand Haven Michigan  49417**
Buyer/Seller Names:  **Boyink / Walter**

| DESCRIPTION | COVERAGE | PREMIUM |
|---|---|---|
| Premium - ALTA Loan (10/17/1992) w/ out exceptions | $ 102,800.00 | $ 258.20 |
| Premium - ALTA Homeowners (10/17/1998) "Freedom Policy" | $ 128,500.00 | $ 663.25 |

---

THANK YOU!!      $-137.90 OWNERS CREDIT GIVEN          Invoice Total Amount Due          $      921.45

NOTE:  Payment is due on closing of the transaction.  Please reference file number (700385224WTA) with payment.

## Chicago Title of Michigan, Inc.

### *Innovation For Your Success*

Woodland Realty-Grand Haven
Betty Pierce
506 S. Beacon Blvd
Grand Haven, MI 49417

Additional copies of title work supplied to:

Heidi Parsons
Prins

Don/Jennifer
Bank of Holland



KB00000012

# STEVEN EGERER DECLARATION

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN EGERER, et al.,

               Plaintiffs,

                 v.

WOODLAND REALTY, INC., et al.,

               Defendants.

_____/

Case No.: 1:06cv0789

Hon. Richard A. Enslen

Hon. Ellen S. Carmody

## DECLARATION OF STEPHEN EGERER

My name is Stephen Egerer, and I have personal knowledge of the facts contained in this Declaration.

1.     On June 14, 2004, my wife and I attended a closing to sell our home that was located at 18177 Yuma Court in Ferrysburg, Michigan to another family.

2.     At some point prior to the June 14, 2004 closing, I recall that our Woodland Realty, Inc. ("Woodland Realty") agent recommended to us that we use the services of an entity called Woodland Title Agency, LLC ("Woodland Title") to conduct the closing on our home.

3.     I trusted the recommendation of Woodland Realty to use Woodland Title for real estate settlement services, and I expected that the recommendation was made with our best interests in mind, and that the recommendation was not made because an illegal financial gain or benefit was being paid or received by any party.

4.     For the closing appointment on June 14, 2004, we were directed by Woodland Realty to go to the offices of a Chicago Title company on Robbins Road in Grand Haven, Michigan.  Nobody at the Chicago Title office ever mentioned an entity called "Woodland

Title," I saw no signs, nameplates, advertising materials, or any indication at this office of an entity named "Woodland Title."  Among the myriad pieces of paper placed in front of us by the Chicago Title employee during the closing, I did not notice any reference to "Woodland Title," nor was there any explanation given to me at the closing regarding any involvement of Woodland Title.  We understood that the person performing all of our real estate settlement services was a Chicago Title employee.  I have never seen any evidence that Woodland Title provided any service or benefit to us in connection with the closing.

5.      Prior to September 2006, I did not know that Woodland Realty, Woodland Title and Chicago Title companies were paying and receiving illegal financial benefits to realtors to encourage them to recommend the services of Woodland Title and Chicago Title companies.

6.      Had I known that Woodland Realty, Woodland Title and Chicago Title companies were engaging in illegal activity to obtain our real estate settlement services business, I would not have agreed to work with them.

I swear under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.


Dated: _____      _____

                                 Stephen Egerer

Title," I saw no signs, nameplates, advertising materials, or any indication at this closing of an entity named "Woodland Title." Among the myriad pieces of paper placed in front of us by the Chicago Title employee during the closing, I did not notice any reference to "Woodland Title," nor was there any explanation given to me at the closing regarding any involvement of Woodland Title. We understood that the person performing all of our real estate settlement services was a Chicago Title employee. I have never seen any evidence that Woodland Title provided any service or benefit to us in connection with the closing.

5.     Prior to September 2006, I did not know that Woodland Realty, Woodland Title and Chicago Title companies were paying and receiving illegal financial benefits to realtors to encourage them to recommend the services of Woodland Title and Chicago Title companies.

6.     Had I known that Woodland Realty, Woodland Title and Chicago Title companies were engaging in illegal activity to obtain our real estate settlement services business, I would not have agreed to work with them.

I swear under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: 2/11/07                                    _____
                                                               Stephen Egerer